original patent; and several parcels of the ground product, together with the machines in which the product was ground, were introduced in evidence, which show, to a demonstration, that, if glue comminuted by grinding is substantially the same product as glue comminuted by the apparatus described in the said specification, the patentee was not the original and first inventor of the patented improvement. But, in the view taken of the case, it will not be necessary to decide that issue in the pleadings, nor whether flake glue, when ground, is substantially the same as flake glue comminuted by the apparatus described in the patent in suit, or substantially different, as will, presently, more fully appear; nor is it necessary to discuss either the third or the fourth propositions submitted by the respondents, as the court is of the opinion, that the complainant fails to show that it is entitled to a decree, for two reasons, other than those submitted in those propositions: (1) Because, the product of the process or apparatus described in the complainant's patent, was not patentable, as the production of it did not, in the sense of the patent law, involve the exercise of any invention or discovery. (2) Because, if the patented product, and the product manufactured by the respondents are substantially the same, then the original patentee was not the original and first inventor of the improvement, as flake glue was ground at a much earlier period than the date of the alleged invention; and, if the patented product is substantially different from the product manufactured by the respondents, then, it is clear, that the charge of infringement is not proved. Testimony was introduced by the complainant, to show that the ordinary glue of commerce is too moist to be conveniently ground, unless it is first dried, and that the process of drying it injures the quality of the article; but the court is of the opinion, that the suggestion is not entitled to weight, as it is a matter of common knowledge that no such difficulty arises, except with the newly-manufactured article, if the glue is deposited and kept from moisture. Grain and corn, in early fall, contain too much moisture for grinding, but they may be sun-dried for the purpose, and no doubt is entertained, that newly-manufactured glue may be dried sufficiently for grinding, without injury, in the same way. Bill dismissed with costs.

[The case was taken by the plaintiffs, on appeal, to the supreme court, where the decree of the circuit court was affirmed. 97 U. S. 3.]

## Case No. 9,608.

### In re MILLIKEN.

[2 Am. Law Rev. (1868) 359.]

District Court, D. Tennessee.

WAR—PAROLE—TERMINATION OF WAR—HABEAS CORPUS.

Milliken was arrested by Lieutenant Hugo of the army, by order of General Thomas, for "violation of his military parole." The alleged violation consisted of acts done in August last.

TRIGG, District Judge, issued a writ of habeas corpus for Milliken, and on its return discharged him from custody, on the ground that the parole was limited by the duration of the war, and that the war had terminated.

---

MILLIKEN (GOODENOW v.). See Case No. 5,535.

---

## Case No. 9,609.

### The MILLINOCKET.

BETHEL et al. v. The MILLINOCKET.

[4 Adm. Rec. 83.]

District Court, S. D. Florida. Dec. 24, 1848.

SALVAGE—UNMANAGEABLE VESSEL—TOWAGE—HANGING RUDDER.

[Towing an unmanageable vessel into smooth water and there hanging her rudder, thus making it possible to navigate her, is salvage service.]

[This was a libel by Joseph Bethel and others against the brig Millinocket for salvage services rendered by the sloop America.]

S. R. Mallory, for libelants.

Wm. R. Hackley, for respondent.

MARVIN, District Judge. It appears from the libel, answer and proof in this case that the brig Millinocket, Harper, master, while on a voyage from Havana to New York, on the morning of the 11th inst. struck upon that part of the Florida Reef known as the "American Shoal," distant about 18 miles from this port, where she remained about two hours. During the time she thumped off her rudder and her false keel, wore off a considerable portion of her keel, started her stempost and forefoot, and chafed some of her plank nearly through, and she began to leak considerably. She then came off the reef and was anchored by the master. She parted her chain and the captain let go another anchor, which held her until the arrival of the libellant Bethel in the sloop America, she having discovered the brig ashore early in the morning with her ensign flying at that time union down, made sail for her, and on his arrival offered his assistance to Captain Harper. Before the arrival of Captain Bethel, Captain Harper had made several efforts to hang his rudder, but the sea was so rough that he found it impossible to do so. He employed Bethel in the first instance to pilot him into Key West, and six of his men to aid at the pumps. The brig was got under way and the attempt made to steer and navigate her by means of her sails, but it was found upon the experiments being made that the brig would neither stay nor wear and was unmanageable, owing, as the master supposed, to the injury she had sustained in her keel and forefoot. The master says that it was impossible for